IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

JOSEPH EDWARD WOOD,

    Plaintiff,

        v.                CIVIL NO.: WDQ-09-3398

DEAN ANTHONY WALTON, *et al.*

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Joseph Wood sued Dean Walton and KMGP Services Company, Inc. ("KMGP") for negligence, and State Farm Mutual Automobile Insurance Company ("State Farm") for breach of contract. For the following reasons, KMGP's motion for summary judgment will be granted in part and denied in part.[1]

---

[1] The Court will also deny Walton's motion to strike the affidavit of David Price that KMGP submitted in support of its motion for summary judgment. *See* ECF No. 77 at 16-19. Walton argues that KMGP failed to disclose any of the facts in the affidavit as required by Fed. R. Civ. P. 26(a)(1)(A). *Id.* at 16-17. But "[t]his is an action in which Fed. R. Civ. P. 26(a)(1) disclosures need not be made." ECF No. 33 at 2 (Court's scheduling order).

I. Background[2]

KMGP operates a Baltimore facility that unloads cargo ships for a steel mill.  Len Crescenzo Dep. 8:16-9:2, Sept. 1, 2010. In summer 2008, KMGP hired Walton, a Louisiana citizen, as a temporary crane operator in Baltimore.  Dean Walton Dep. 6:12-13, 7:5-8, 19:22-20:4, Oct. 22, 2010.  Walton worked the night shift, 7 p.m. to 7 a.m., but did not work every day during his Baltimore stay.[3]  His job was "[d]ischarging boat coal out of [a] ship and putting it on the bank."  Id. 29:11-16.

While in Baltimore, KMGP supplied Walton with a hotel room, allowances for meals, a rental car and fuel.  Len Crescenzo Dep. 18:21-20:3, 59:1-17.  The company allowed Walton to drive the rental car for personal use, and told Walton not to take out insurance for the rental car.  Id. 40:1-21; Dean Walton Dep., 31:11-16.

A written KMGP policy prohibited alcohol on the job,[4] but

---

[2] In reviewing a motion for summary judgment, the non-movants' evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

[3] See id. 25:12-18, 63:14-64:8.  Walton worked for KMGP in Baltimore for 28 days.  Dean Walton Dep. 19:22-20:3, Oct. 22, 2010.

[4] Drugs and Alcohol in the Workplace Policy [hereinafter "Policy"], ECF No. 75, Ex. 2 at 2.

2

the Baltimore facility was "kind of a drinking place."[5]  The
company allowed employees to drink during company sponsored
business or social functions "where the use of alcohol
remain[ed] moderate."  Policy at 2.  Supervisors could be
reimbursed by the company for taking employees out to happy
hours.  Len Crescenzo Dep. 51:5-8.  Violations of the alcohol
policy "[would] result in disciplinary action . . ., up to and
including termination."  Policy at 6.

Despite the policy prohibiting drinking on the job,
employees routinely drank alcohol during the night shift.  Dean
Walton Dep. 58:4-60:22.  One employee regularly made and
distributed "snow balls" -- vodka or bourbon poured over shaved
ice.  *Id.* 58:4-60:1-9.  Walton's shift supervisor, Mike Elias,
knew of this custom and sometimes consumed snowballs while
working.  *Id.* 61:19-62:11.  When a co-worker first offered
Walton a snowball, Walton accepted, not knowing that it
contained alcohol.  *Id.* 59:9-15.  Although Walton "wasn't into
drinking like that," he "didn't want to hurt [the co-worker's]
feelings."  *Id.* 59:14-18.  He "held [the snowball] for a while"
then threw it away when the co-worker wasn't looking.  *Id.*
59:18-19.  Walton never took another bite of a snowball.  *Id.*
60:22-61:6.

---

[5] Dean Walton Dep. 58:6-7.

After the night shift, the crane operators, truck driver, and front-end loader regularly went to a bar called The Fort, and Elias would buy the first one or two rounds of drinks. *Id.* 34:21-35:9.   Elias showed Walton how to get to the bar, and Walton joined his co-workers "a couple of times" to "get a couple beers." *Id.* 35:9-36:6.   Walton would buy "the second round or the third round," and Elias "wasn't used to [anybody] else buying them." *Id.* 56:20-57:6.

On August 4, 2008, Walton joined his co-workers[6] at The Fort because "it was at the end of the job" and he "had a lot of peer pressure." *Id.* 35:12-16.   He stayed at the bar "[a] couple of hours," "had quite a few" beers,[7] and drank at least one shot of Jägermeister, a liqueur. *Id.* 40:1-14-41:16.   Although he knew he was drunk, Walton tried to drive from the bar to his hotel. *Id.* 42:1-44:3.   Walton ran a red light and collided with Wood, who was turning through an intersection on a motorcycle.   ECF No. 42 at 2.   Wood was severely injured.   ECF No. 48 at 1-2.[8]

On September 23 and November 13, 2009, Wood sued Walton for negligence, KMGP for vicarious liability and negligent

---

[6] Walton testified that he was not sure whether Elias went to The Fort that day.   Dean Walton Dep. 38:1-8.

[7] Later in his deposition Walton said that he had "too many" beers.   Dean Walton Dep. 40:14-19.

[8] Wood suffered serious leg, urological, and facial injuries. ECF No. 48 at 1-2.

4

entrustment and supervision, and others in the Circuit Court for Baltimore City. ECF Nos. 2, 6. Wood also sued his insurer, State Farm, for failing to honor his uninsured motorist coverage. *Id.* On December 18, 2009, the case was removed to this Court on the basis of diversity jurisdiction.[9]

On May 21, 2010, the Court granted summary judgment to Wood on the issue of Walton's liability, finding that Walton had negligently injured Wood. ECF No. 42 at 8.

On August 26, 2011, KMGP moved for summary judgment. ECF No. 74. On September 12, 2011, State Farm opposed that motion. ECF No. 75. On September 16, 2011, Wood and Walton opposed the motion. ECF Nos. 76, 77. On October 3, 2011, KMGP filed its reply. ECF No. 79.

II. Analysis

A. Standard of Review

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to

---

[9] ECF No. 1. Wood is a citizen of Maryland, and Walton is a citizen of Louisiana. ECF No. 1 at 2. State Farm is a citizen of Illinois, where it is incorporated and has its principal place of business. ECF No. 1 at 2; *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 102 (4th Cir. 2011) ("For federal diversity jurisdiction purposes, a corporation is a citizen of the states in which it has been incorporated and in which it has its principal place of business."). KMGP is a citizen of Delaware, where it is incorporated, and Texas, its principal place of business. *Id.*

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

B. KMGP's Motion

KMGP argues that it is entitled to summary judgment on the vicarious liability claim because, at the time of the accident, Walton was not acting within the scope of his employment, he lacked KMGP's authority to drive while intoxicated, and KMGP did not ratify his conduct.  ECF No. 74-1 at 2.  KMGP contends that

Wood's negligent entrustment and supervision claims[10] also must fail because he cannot show that the company knew or should have known that Walton would use the rented vehicle in a dangerous manner, or that KMGP failed to use proper care in hiring or training Walton. *Id.* at 2, 11.

The other parties counter that neither claim can be resolved by summary judgment because each involves a genuine dispute of material fact. ECF No. 75 at 7; ECF No. 76-1 at 4, 10; ECF No. 77 at 4-5.

1. Vicarious Liability

Under Maryland law,[11] an employer may be liable for acts "which his [employee] does with the actual or apparent authority of the [employer], . . . the [employee] does within the scope of his employment, or . . . the [employer] ratifies with the knowledge of all the material facts." *See, e.g.*, *Oaks v. Connors*, 660 A.2d 423, 426 (Md. 1995) (internal citation and quotation marks omitted).

---

[10] Wood raised negligent entrustment and negligent supervision in Count IV of the second amended complaint.

[11] Because this case involves diversity jurisdiction, the Court "must apply the substantive law of the forum state." *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). In tort cases, Maryland courts follow the rule of *lex loci delicti* and apply the law of the place where the injury occurred. *Lewis v. Waletzky*, 31 A.3d 123, 129 (Md. 2011). Wood was injured in Maryland, so Maryland law applies.

a. Scope of Employment

Wood and Walton argue that Walton was acting within the scope of his employment during his entire stay in Maryland.  ECF No. 76-1 at 6; ECF No. 77 at 15.  Walton contends that, but for his employment with KMGP, he "would have [had] no reason to be in the State of Maryland" at the time of the accident.  ECF No. 77 at 15.  KMGP counters that no case supports "this unsubstantiated leap," and Maryland courts would likely follow other jurisdictions that have rejected "this 'perpetual' scope of employment theory."  ECF No. 79 at 5-8.

"Whether an . . . individual's conduct falls within the scope of employment is normally a question for the jury."  *S. Mgmt. Corp. v. Taha*, 836 A.2d 627, 639 n.6 (Md. 2003).  "Nevertheless, where but one reasonable inference can be drawn from the undisputed material facts, the question is one of law for the court."  *Henderson v. AT&T Info. Sys., Inc.*, 552 A.2d 935, 941 (Md. Ct. Spec. App. 1989).

An employee's acts fall within the scope of his employment if "they were done by the [employee] in furtherance" of the employer's business, "and were such as may fairly be said to have been authorized by him."[12]  An act is "authorized" if it is

---

[12] *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991) (*quoting Hopkins Chem. Co. v. Read Drug & Chem. Co. of Balt. City*, 92 A. 478, 479-80 (Md. 1914)).

"incident to the performance of the duties entrusted to [the employee] by the [employer], even though in opposition to his express and positive orders."[13]

"In applying this test, there are few, if any absolutes," *Sawyer*, 587 A.2d at 471, but Maryland courts have cited with approval the Restatements of Agency.[14]  Thus, to be within the scope of employment under Maryland law, conduct must (1) be of the kind the employee is hired to perform, (2) occur during a period "not unreasonably disconnected from the authorized period of employment," (3) take place in "a locality not unreasonably distant from the authorized area," and (4) be "actuated at least in part by a purpose to serve the [employer]."  *Sawyer*, 587 A.2d at 471.  Maryland courts also consider whether the employer "has reason to expect that such act will be done," or furnishes the "instrumentality by which the harm is done."  *Id.* (internal citation and quotation marks omitted).

---

[13] *Sawyer*, 587 A.2d at 470 (internal citation and quotation marks omitted).  *See also Houghton v. Forrest*, 989 A.2d 223, 231 (Md. 2010) (police officer's arrest of plaintiff was within the scope of his employment because it was "incident to his general authority as a police officer").

[14] *See, e.g.*, *A & P Co. v. Noppenberger*, 189 A. 434, 440 (Md. 1937) (citing Restatement of Agency § 229 (1933) for factors to consider in determining whether unauthorized conduct may nonetheless be within the scope of employment); *Rusnack v. Giant Food, Inc.*, 337 A.2d 445, 459 (Md. Ct. Spec. App. 1975) (citing Restatement (Second) of Agency § 229 (1958) to describe conduct within the scope of employment).

In cases involving negligent use of an automobile, Maryland courts have held that an employer may be vicariously liable if the employee is "engaged at the time in furthering the [employer's] business" and

> the [employer] expressly or impliedly consents to the use of the automobile, and had the right to control the [employee] in its operation, or else the use of the automobile was of such vital importance in furthering the [employer's] business that his control over it might reasonably be inferred.

*Oaks*, 660 A.2d at 426 (internal citation and quotation marks omitted).  Thus, the Maryland Court of Appeals has found that a grocery store was not vicariously liable for the negligence of its employee while driving to work, in part because the employee "was not actually performing any of his designated job responsibilities at the time of the accident," and the company

> exerted no control over the method or means by which [the employee] operated his vehicle.  It did not supply or pay for the vehicle that [the employee] used or for its maintenance, fuel, or repair.  It also did not specify the type of vehicle to be used . . .

*Id.* at 427.  By contrast, the court has found a newspaper vicariously liable for the negligence of its reporter when the reporter was driving to a meeting in his own car, the newspaper instructed him to go to the meeting by a specific route, the reporter followed that route, and the newspaper paid for the

fuel. *Regal Laundry Co. v. A.S. Abell Co.*, 163 A. 845, 847-48 (Md. 1933).[15]

"Driving to and from work is generally not considered to be within the scope of . . . employment because getting to work is the employee's own responsibility and ordinarily does not involve advancing the employer's interest." *Oaks v. Connors*, 660 A.2d 423, 427 (Md. 1995). Thus, "absent special circumstances, an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to or from work." *Dhanraj v. Potomac Elec. Power Co.*, 506 A.2d 224, 226 (Md. 1986).[16] "[T]he requisite 'special circumstances' must admit some express or implied *control* over the vehicle or *consent* to its use in

_____

[15] *See also L.M.T. Steel Prods. v. Peirson*, 425 A.2d 242 (1981) (employee was acting within the scope of his employment when he drove from a jobsite to use a public telephone to make a job-related call).

[16] In *Dhanraj*, the Maryland Court of Appeals held that an employer was not vicariously liable for its employee's negligence in driving his own car to a training facility during a six-week work assignment. Although the employee's attendance at the training school may have been within the scope of employment, the court found that "mere travel to and from the facility" was not, because the employee "was not about his [employer's] business while getting there or leaving there." *Dharanj*, 506 A.2d at 226. Moreover, the court noted that the employer had not instructed the employee to use the car. *Id.* at 227. The employee had been given a travel allowance but was free to use it for a taxi or a hotel room near the training site. *Id.*

11

Case 1:09-cv-03398-WDQ   Document 80   Filed 02/29/12   Page 12 of 22

*performing work duties*." *Barclay v. Ports Am. Balt., Inc.*, 18
A.3d 932, 938 (Md. Ct. Spec. App. 2011) (emphasis in original).

In cases involving car accidents on business trips, courts
applying Maryland law have determined the employer's liability
by looking not to the overall purpose of the trip but whether
the employee was engaged in his duties *at the time of the
accident*. Thus, a software engineer was not acting in the scope
of his employment when he struck another car while driving from
New Jersey to Virginia to begin a year of graduate studies, even
though his employer conditioned his employment on completing the
studies and paid the tuition, moving expenses, and travel costs.
*Henderson*, 552 A.2d at 941. The Maryland Court of Special
Appeals emphasized that the employee was "not 'on the job' at
the time of the accident," and his business purpose was to
"pursue a course of study," "not driv[e] his car for the benefit
of [his employer]." *Id.* at 940.[17]

---

[17] *See also Kerns v. United States*, Case No. CCB-07-1006, 2011 WL
1230360, at *5 (D. Md. Mar. 28, 2011) (employee was not acting
within scope of employment during accident on business trip
because, *inter alia*, employee "was not actually engaged in
executing job-related duties at the time of the accident";
"[t]he mere fact that she was driving towards Annapolis to
attend [a work] meeting is not sufficient to find that she was
engaged in the execution of job-related duties"); *Gavin v.
Grady*, Case No. JFM-10-385, 2010 WL 5479645, at *3-*4 (D. Md.
Dec. 30, 2010) (employee was not acting within the scope of her
employment while driving from breakfast to a training site while
on three-day training trip; "[a]ssuming that once [the employee]
arrived at the . . . training site she was within the scope of
her employment, mere travel to and from the training site was no

The Court has not found any Maryland case holding that a person acts within the scope of his employment every moment of a business trip -- no matter how long -- merely because the employer provides lodging and transportation.  But courts in other jurisdictions that apply the Restatement of Agency have expressly rejected this notion.  Applying Hawaii law,[18] the Ninth Circuit has held that a D.C.-based civilian employee, assigned for "a few weeks" to work on a Navy ship moored in Hawaii, was not acting within the scope of his employment when he rear-ended another car while leaving the Navy base in his rental car "some distance from the ship."  *Clamor*, 240 F.2d at 1216-17.  Even though his employer had paid for the employee's lodging and rental car, the Ninth Circuit emphasized that the employee "was not working the entire time he was in Hawaii," was off duty when the accident occurred, was "not engaged in any errand for his employer," and his employer "derived no benefit from [his]

---

more within the scope of her employment than was travel to and from her usual jobsites in performing her duties . . . ").

[18] "Hawaii courts follow the Restatement (Second) of Agency § 228."  *Clamor v. United States*, 240 F.2d 1215, 1217 (9th Cir. 2001).  "Under this test, an employee's conduct is within the scope of employment only if (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the master . . . ."  *Id.*

activities once he stopped working . . . and left for the day."[19]

Similarly, the Second Circuit has applied Connecticut law[20] and rejected the argument that "persons on temporary duty are at all times acting solely for the employer's benefit, and are always within the scope of their employment." *Cronin*, 818 F.2d at 1066 (internal quotation marks omitted). In *Cronin*, the Second Circuit held that a Hawaii-based employee was not acting within the scope of his employment during an 88-day training assignment in Connecticut when he drove a rental car while intoxicated and collided with a motorcyclist several hours after his class had ended. *Id.* at 1064-65, 1068-69. Although his employer had provided the rental car, paid for his lodging and

---

[19] *Id.* at 1217. *See also Henderson v. Prof'l Coatings Corp.*, 819 P.2d 84, 89-90 (Haw. 1991) (employer was not vicariously liable when its employee caused an accident while driving a rental car off duty during a business trip; although the employer had provided for the rental car and lodging during the month-long trip, driving the car was not the kind of act the employee was hired to perform, did not occur during authorized work hours, was not actuated by a purpose to serve the employer, and the employer did not receive any direct benefit); *Kang v. Charles Pankow Assocs.*, 675 P.2d 803, 809 (Haw. Ct. App. 1984) ("[T]he liability imposed upon the employer is not open-ended and unlimited. The employer's liability is limited by the test of whether the employer's risks are incident to his enterprise, or the enterprise theory which finds liability if the enterprise of the employer would have benefited by the context of the act of the employee but for the unfortunate injury.") (internal citations and quotation marks omitted).

[20] "Connecticut law is not out of line with the basic American law on 'scope of employment' related in Restatement (Second) of Agency §§ 228-237." *Cronin v. Hertz Corp.*, 818 F.2d 1064, 1066 (2d Cir. 1987).

other *per diem* expenses, and allowed the employee to use the
rental car for personal use, the Second Circuit emphasized that
an employer's liability turns on whether the employee's conduct
created a risk typical for that type of employment, and
"different from those [risks] attendant on the activities of the
community in general." *Id.* at 1068. Drunk driving, many hours
after the work day, was not a risk incidental to attending
training courses. *Id.*

Looking at the undisputed facts here, the Court can draw
only one reasonable inference: Walton was not acting within the
scope of his employment at the time of the accident. Walton was
hired as a temporary crane operator to unload coal from a ship.
Dean Walton Dep. 6:12-13, 7:5-8, 19:22-20:4, 29:11-16. Driving
a car from a bar to his hotel was neither incident to these
duties nor conduct he was hired to perform. *See Sawyer*, 587
A.2d at 470-71. The accident occurred while Walton was off duty
and away from his work site.[21] *See id.* Moreover, Walton's going

---

[21] Although Wood argues that Walton was leaving a "company event"
at the time of the accident, *see* ECF No. 76-1 at 8, there is no
evidence to support this. The evidence shows that Elias, a KMGP
supervisor, often bought after-work rounds of drinks at The
Fort, and managers could be reimbursed by KMGP for happy hours
with employees. Len Crescenzo Dep. 51:5-8; Dean Walton Dep.
34:21-35:9. But there is no evidence that Elias was at The Fort
the day of Walton's accident, or that he had bought drinks for
the employees and been reimbursed by KMGP.

to the bar and driving to his hotel did not in any way serve
KMGP.  *Id.*[22]

That KMGP provided a rental car and hotel room does not
require a different result.[23]  Providing a car and lodging was
more likely an "indication of the inconvenience" of working far
from home, not "an indication that the employer considered all
actions taken while driving that car to be within the scope of
employment."  *See Clamor*, 240 F.3d at 1217.  Courts applying
Maryland law to car accidents on business trips have looked to
the employee's conduct at the time of the accident, not the

---

[22] Wood's citation of *Wilkinson v. United States* is unavailing.
*See* ECF No. 76-1 at 8.  In that case, a U.S. Navy boatswain's
mate was ordered to drive from his ship, docked in Massachu-
setts, to Virginia to pick up and deliver certain items,
including mail. *Wilkinson*, 677 F.2d 998, 999 (4th Cir. 1982).
The Navy paid him a *per diem* allowance for mileage, lodging and
meals.  *Id.*  After delivering the ship's mail in Virginia, the
mate was driving to dinner when he struck a pedestrian.  *Id.*
Applying Virginia law, the Fourth Circuit found that the mate
was acting within the scope of his employment at the time of the
accident.  *Id.* at 999.  Unlike this case, however, the employee
was driving from his post to dinner, a meal authorized and paid
for by his employer; he was not driving to a hotel from a bar
where he had been socializing and drinking alcohol.  There is
also nothing in the *Wilkinson* opinion to suggest that the
boatswain's mate was in Virginia for many weeks.

[23] All the Maryland cases cited above have involved an employee's
personal car, a distinction emphasized by the non-moving
parties.  *See* ECF No. 76-1 at 7 (in all the cited cases, "there
was no evidence from which a trier of fact could reasonably
conclude that the employer exercised control of the vehicle"
because the "vehicles being driven . . . were not provided by
their employers"); ECF No. 77 at 14 ("Simply put, if KMGP did
not consider there to be a business purpose for the vehicle, Mr.
Walton would not have had one so arranged.").

overall purpose of the business trip. *See, e.g.*, *Henderson*, 552 A.2d at 940-41.[24]  Moreover, the Court finds persuasive those cases from other jurisdictions that have rejected the concept of perpetual employment during a temporary assignment. *See, e.g.*, *Clamor*, 240 F.2d at 1216-17; *Cronin*, 818 F.2d at 1066. Accordingly, the Court holds as a matter of law that Walton was not acting within the scope of his employment at the time of the accident.

      b. Actual or Apparent Authority

    Neither actual nor apparent authority is present here. These concepts arise in contexts when a person represents, or purports to represent, another "in contractual negotiations or transactions akin thereto."[25]  Wood's injuries did not arise from

---

[24] Walton has not persuaded the Court that he was within a "special circumstance" to the general rule that commuting to or from work is not within the scope of employment. *See* ECF No. 77 at 14; *Dhanraj*, 506 A.2d at 226. He was not driving to or from work at the time of the accident, but from a bar to his hotel. The Court is also not persuaded by Walton's legally unsupported argument that his use of the car for any purpose was within the scope of employment because KMGP instructed him not to buy insurance. *See* ECF No. 77 at 14-16.

[25] *See Globe Indem. Co. v. Victill Corp.*, 119 A.2d 423, 427 (Md. 1956) (defining agent); *Dickerson v. Longoria*, 994 A.2d 721, 735 (Md. 2010) (defining agency relationship, and actual and apparent authority).  Agency arises when the principal confers actual authority on the agent by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Dickerson*, 994 A.2d at 735 (internal citation and quotation marks omitted).  "Apparent authority results from certain acts or manifestations by the

such transactions with Walton.  Thus, neither actual nor apparent authority can be the basis of Wood's vicarious liability claim.[26]

### c. Ratification

Ratification, another agency concept, is also inapplicable. "When the agent has no authority to do an act, the principal may later ratify the act, giving it the same effect as if it had been originally authorized."[27]  As stated above, Walton was not acting as KMGP's agent when he negligently caused the accident. *See supra* Part II.B.1.b.  Thus, there is no evidence that his conduct was later ratified by the company.

For all these reasons, the Court will grant KMGP's motion for summary judgment on Wood's vicarious liability claim.

---

alleged principal to a third party leading the third party to believe that an agent had authority to act." *Id.* (internal citation and quotation marks omitted).  A principal can be bound by an agent acting within the scope of his actual authority, or by a purported agent acting with apparent authority.  *Id.*

[26] *See Baltimore Police Dep't v. Cherkes*, 780 A.2d 410, 439 (Md. Ct. Spec. App. 2001) ("Vicarious liability is a function of status.  The possible legal relationships that can give rise to vicarious liability are employment, agency, partnership, or joint venture.").

[27] *Citizens Bank of Md. v. Md. Indus. Finishing Co.*, 659 A.2d 313, 320 n.9 (Md. 1995).  The principal ratifies simply by manifesting its intention to treat the act as authorized.  *Id.* One way of doing this is to accept a benefit that the principal would not have received but for the previously unauthorized act. *See Smith v. Merritt Sav. & Loan, Inc.*, 295 A.2d 474, 480 (Md. 1972).

2. Negligent Entrustment

Maryland has adopted the Restatement (Second) of Torts approach to negligent entrustment,[28] which requires Wood to show that (1) KMGP made its car available to Walton, (2) KMGP knew or should have known that Walton was likely to use the car "in a manner involving risk of physical harm to others," and (3) Wood was within the class of people KMGP expected or should have expected to be endangered by Walton's use of the car. *See Moore v. Myers*, 868 A.2d 954, 964, 966 (Md. Ct. Spec. App. 2005). KMGP argues that Wood has presented no evidence that the company knew or should have known that Walton was likely to use the rental car in a dangerous manner. ECF No. 74-1 at 9.

"There is no litmus test to determine whether a supplier had the requisite knowledge of an entrustee's propensity to use the entrusted chattel in an improper or dangerous manner."[29]  The entrustor is "only responsible for the [entrustee's] subsequent negligent acts . . . if a reasonable man could have foreseen the negligent acts." *Curley v. Gen. Valet Serv., Inc.*, 311 A.2d 231, 241 (Md. 1973).  "[W]hen the foreseeability of harm stems from past conduct, it must be conduct so repetitive as to make its recurrence foreseeable." *Id*.

---

[28] *See, e.g.*, *Robb v. Wancowicz*, 705 A.2d 125, 128 (Md. Ct. Spec. App. 1998) (*citing* Restatement (Second) of Torts § 390 (1965)).

[29] *Morris v. Weddington*, 539 A.2d 1145, 1148 (Md. Ct. Spec. App. 1988), *rev'd on other grounds*, 579 A.2d 762 (Md. 1990).

In the case of drunk driving, "[n]o quantitative line can be drawn with respect to the amount of knowledge which an owner must have of a driver's propensity for drinking to make the owner negligent in entrusting a motor vehicle to him."[30]  "All of the circumstances of the case must be considered."  *O'Brien*, 140 F. Supp. at 311 (*quoted in Curley*, 311 A.2d at 239).

Here, the record shows that KMGP employees regularly went to a bar after the night shift and had several rounds of drinks, a KMGP manager customarily bought the first one or two rounds, Walton worked the night shift for 28 days and went to the bar "a couple of times" to "get a couple beers," he drove himself in the rental car provided by KMGP, and Walton had gotten drunk at the bar before causing the accident with Wood.  Dean Walton Dep. 19:22-20:3, 34:21-36:6, 40:1-44:3.  Emphasizing Walton's use of the word "couple," KMGP argues that nothing "suggests that Walton had ever overindulged" before the day of the accident or otherwise put the company on notice that he "should not have been entrusted with a vehicle."  ECF No. 74-1 at 10; ECF No. 79 at 12-13.

Viewing the evidence in the light most favorable to the non-moving parties, a reasonable jury could conclude that Walton

---

[30] *Maryland v. O'Brien*, 140 F. Supp. 306, 311 (D. Md. 1956) (applying Maryland law), *quoted in Curley v. Gen. Valet Serv., Inc.*, 311 A.2d 231, 239 (Md. 1973).

had been to The Fort two or more times[31] in 28 days, and had

drunk two or more beers on each occasion before driving himself

to the hotel in the rental car.[32] How quickly he drank on those

visits, and what effect the alcohol had on his ability to drive,

remains unclear. Thus, the Court cannot say, as a matter of

law, that KMGP could not have known that Walton would have

driven the rental car in a dangerous manner.[33] The Court will

deny summary judgment on the negligent entrustment claim.

3. Negligent Supervision

"To establish a cause of action for negligent hiring or

supervision, the plaintiff must show that [his] injury was

caused by the tortious conduct of an employee, the employer knew

or should have known that the employee was capable of inflicting

harm of some type, the employer failed to use proper care in

---

[31] *See United States v. King*, 424 F. App'x 389, 396 (5th Cir.
2011) ("Although in its dictionary sense, "couple" means "two,"
it is broadly used colloquially in reference to a small but
inexact number."). In *King*, the Fifth Circuit found that
"couple" was consistent with "four." *See id.* at 395-96.

[32] Although Walton said that he had gone to the bar on earlier
occasions for "a couple" beers, he also testified that he would
buy "the second or third round" on his visits, suggesting
that he would have more than two beers per visit. *See* Dean
Walton, 57:1-6.

[33] Elias's knowledge of Walton's earlier drinking could be
imputed to KMGP. *Cf. Md. Comm'r of Labor & Indus. v. Cole
Roofing Co.*, 796 A.2d 63, 70 n.5 (Md. 2002) (supervisor's
knowledge of statutory violation could be imputed to the
company).

hiring or training the employee, and the employer's breach was the proximate cause of the plaintiff's injury." *Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 484 (D. Md. 1999) (applying Maryland law).

KMGP argues that Wood's negligent supervision claim lacks factual support because there is no evidence that KMGP failed to use proper care in hiring or training Walton.[34]  Because Wood did not respond to this argument, he has abandoned the negligent supervision claim.[35]

III. Conclusion

For the reasons stated above, KMGP's motion for summary judgment will be granted in part and denied in part.

2/28/12
_____          _____
Date                     William D. Quarles, Jr.
                         United States District Judge

---

[34] KMGP also restates its argument that it could not have foreseen that Walton would cause harm to others.  ECF No. 74-1 at 11.

[35] *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (plaintiff abandoned claim by failing to address it in her opposition to the defendant's motion for summary judgment).